Mr. Robinson. Thank you, your honor. I'm Spencer Robinson here representing Jeffrey Sand Company. I've listened carefully to the other arguments this morning and I don't think ours is quite near as complicated as yours. I'm happy to say. We are making primarily two arguments. What we have is a situation where a jury answered an interrogatory that said if you find that the plaintiff's compensatory damages have no monetary value then you award a dollar and that's what happened. And then on top of that they awarded a punitive damage award of $250,000. Our primary argument in this appeal is twofold. One is we don't think that there was sufficient evidence to submit the punitive damage award to the jury at all. And the second argument that we have is is that it violates due process. And let me explain the first argument and then the second argument. And we have a third argument that has to do with attorney's fees and awards which, depending on what this court does, may very well impact the district court's opinion because of success on the merits. And the other issue that we raised, which had to do with what's your normal hourly rate, which was never entered or allowed. What happened in this case was this gentleman worked on a dredge in the Arkansas River called the Cora. There were four people on the dredge. There was another gentleman by the name of Bateman, another gentleman by the name of Lambert, and there was a lead man by the name of Skaggs. And these people are shuttled out to this boat dredge. They work during the day, then they shuttle back in to the shore and go home. What this gentleman claimed was that Skaggs, his lead man, subjected him to some extremely obscene, racially motivated, racially oriented, improper language at work while he's on the Cora. He also testified at trial that these racial epithets that were directed to him occurred at times in front of both Mr. Lambert and Mr. Bateman. He specifically identified them in his testimony as witnesses to this. His first complaint to the company, which by the way has 28 employees, was in late April, early May of 2012. What the plaintiff testified to was is that he spoke on the in-person twice to the president of the company, a fellow by the name of Joe Wickliffe. Mr. Wickliffe, unfortunately, was not available to testify at trial because he'd had a stroke in 2013 and can't speak. So he was not called as a witness. And no depositions or anything else put in? There was no way to take a deposition. No, I mean, you know, from any time earlier, period. Proceed. Okay. What ended up happening was is that in trying to nail down when this conversation occurred, one of the things that the plaintiff said in his testimony was is that he had these four conversations with Mr. Wickliffe and then Mr. Wickliffe told him that he was going to turn his complaint over to the plaintiff, Mr. Bolton, to review. And there are notes that are in the record that indicate from Mr. Bolton to another gentleman by the name of Randy Marshall, who also couldn't be called to testify because he was dead at the time of trial, that those investigations and the report from Mr. Marshall occurred on May the nail down the time frame of when these complaints were made to Mr. Wickliffe and when the investigation occurred that way. The plaintiff testified that he couldn't remember the exact dates of when he complained and as a matter of fact, his testimony even read in the most the best light to him, he couldn't say nor did he establish that he ever complained about anything further with respect to racial slurs being directed to him after May of 2012. In other words, until his termination, which was found to be legitimate for appropriate reasons, in February of 2013, the company has no record of having received any further complaints. Now what ended up happening was that the company in this first instance in early 2012 put a gentleman named Randy Marshall on the Quora for three days to observe what was happening on the Quora to determine whether or not he could pick up any inappropriate language being used, any inappropriate methods being used by the lead man with respect to the people that worked on the back and reported on May the 12th. I can't find anything going on there. The crew seems to be working well and everything seems to be fine to me and that was the nature of the investigation. That was heavily criticized in the trial by the plaintiff as being an incomplete and sort of investigation. The jury apparently believed that. Perhaps they did. Proceed. But here's the point. In order to show reckless disregard under the law in order to get punitive damages, it has to be more than negligence. Malice and reckless disregard have been defined by this court to be more than just a negligent investigation. In other words, it's a lack of good faith almost is the way I read the law. But all that being said, that investigation and that result occurred outside of the statute of limitations because this lawsuit was not filed until July of 2012. You mean 2016, right? 2016. I'm sorry, that's right. So the four-year statute of limitations is in July of 2012. So it's outside the statute of limitations. What this court has said in 1999 is acts that occur outside of the statute of limitations in a continuing violation type case can be used for purposes of potential liability. They can be referred to to support allegations of violations of the law within the statute of limitations. In other words, if there's a continuation of that that gets into the statute of limitations period and in fact you have this pre-statute of limitations activity, that can be used for the purposes of determining liability. It cannot be used according to this court for purposes of determining damages. And that's the Kline versus City of Kansas City case that we decided in 1999. So if that's the law, here in essence was our argument. Yes, there was a statute of limitations period of time. That was looked into. You can argue that that investigation wasn't as thorough as it should have been, but the fact is there was an investigation. Second, after the statute of limitations is no longer a bar, there is no complaint. There is no evidence. There's an anomalous email, right? That occurs in January the 30th of the next year, 2013, at which time the company stopped everything and interviewed every single employee on the CORA, every single employee who had any contact with the CORA, and to a person including Mr. Bateman and Mr. Lambert, who supposedly had both personally heard this stuff over the period of time, including back in early 2012, every one of them said, it's here so we've never heard it. They didn't talk to Bryant though, right? Do I understand the record? That's right. Mr. Bryant was not interviewed in 2013. Or 2012, correct? That's right. As far as we know, because as I told you, the president of the company to whom he registered the complaint couldn't testify. So we don't know, but what we do know is what's on the record, and yes, what's on the record is that he was not interviewed by Mr. Marshall or Mr. Bolton in early 2012. That's true. And he wasn't interviewed by Mr. Bolton in 2013 because basically what the email said was that they had heard racial statements being made. We assume those were directed at Mr. Bryant because he was the African-American employee on the Corps, but they didn't talk to Mr. Bryant. And I couldn't even establish whether he was at work because soon after that, he'd missed so much work in the fall and in early 2013 he was ultimately terminated for that absenteeism. So I don't even know that he was available. He was alive though. He was alive and even assuming he was available. The fact of the matter is nobody corroborated what he had said in 2012 or what this email implied might have been happening in 2013. Consequently, it's our position that there's no reprehensible conduct within the statutory period of limitations taken by the company. There are no complaints. We were talking about a hostile work environment though, so what you're asking us to do is say, well, you can look at the overall hostile work environment claim so long as one act is within the statute, but when it comes to punitive damages, you can only look at what's happened after the statute has run? Yes. That's what the court ruled. That's what this court ruled in 1999. But in a sense, the whole hostile work environment claim has not run because one act has been committed within the time frame. I understand, but you see what I'm also saying, Your Honor, is that in the period of time after 2012, after that investigation was made in May, there were no complaints. The company was not put on notice of anything going on until they got an email on January 30, 2013. Is that contested though? I mean, I understood from the Appleese brief that Bryan said he continued to complain, that a guy named Lambert said he told management about it. Lambert testified at trial that he never told management about any type of racial slurs being used. That was his somebody that. Who did he tell? He said he'd heard. He told Bateman, is the hearsay guy, who actually we found out later on was the author of the email, and then he came and testified at trial and he said, I've never heard it either. So when the Appleese says on page 17, Donald Lambert testified he told management officials that Jerry Skaggs was referring to the plaintiff as porch monkey and boy, that is not correct. And if you look at our reply brief, we bring that up, certain material, what we thought were material misrepresentations of the record, and there's four of them, and they're all in our reply brief, and that's one of them. And you're into your rebuttal, so you probably would like to reserve what little time I have. You may, of course. Mr. Porter. May it please the court. My name is Austin Porter, Jr. I'm here on behalf of Mr. Bryant. Mr. Robinson, I guess, is re-arguing his case. As a matter of fact, he was making arguments, the same arguments that he made to the jury, and obviously the jury didn't go with him. And so I guess what Mr. Robinson is asking this court to do is to re-litigate the case and make credibility findings. The jury heard the testimony that was presented in this case, and the jury came back with the decision that it made. Now, one of the things that I asked Mr. Bolton, who was like the manager of this Jeffrey Sand Company, it's on page appendix 79, and I specifically asked Mr. Bolton, I said, Mr. Bolton, would you agree with me, sir, that if the company was really concerned about harassment of employees, that the employees being harassed? His answer, we didn't in this case because we didn't think there was any relevance to it. My next question, I'm just trying, I'm just saying, my question is, do you think if the company was serious about employees being harassed, the company would at least make an attempt to talk to the person who has been at least saying that they are being harassed? Would you agree with me? I would agree with you, yes, sir. So the jury, Your Honor, heard testimony from Mr. Bryant, as well as the other witnesses. Mr. Bryant specifically said that he continued to complain to management official. He had four different conversations with Joe Wycliffe, who was the owner of the company. He spoke to him twice by phone, spoke to him in person. One of the times that my client indicated that he spoke with Mr. Wycliffe about the I'm gonna let him deal with it. Basically, I don't want to hear anything else from you. And that was their attitude. And the company attitude, Your Honor, has indicated that my client was lying, Mr. Lambert was lying, and they did not even want to hear anything about a racial harassment. And another interesting point in this case, Your Honor, that was brought out, the company does not even have an anti-harassment policy. No, no such policy. So obviously they don't take harassment claims serious enough to even have an anti-harassment client policy. So I don't know if they're trying to rely on this affirmative defense of Elahard or Farraghar affirmative defense, which they can't do because they don't even have an anti-harassment policy. And so, Mr. Let me interrupt you for a second. Yes, Your Honor. I don't think you responded on the Klein case. That's the 1999, you're familiar with it, E.L. Klein v. Kansas City Police Department, and they say it says that you can only recover damages, they say it's a federal employment discrimination claim, I'm just reading from their brief, for acts during the statute of limitations period, even if it's a continuing violation. Are you familiar with the case? Yeah, that, it is our position, Your Honor, that Mr. Brian continued to complain about that, and also I will submit, Your Honor, that that was, I guess, a new argument that the Jeffrey Sand has made. They didn't make that argument, of course, in their motion for directive verdict or motion for judgment as a matter of law that I recall, and that's something that was new that they're presenting here. And so that's kind of caught me off guard. But again, Your Honor, the jury in this case heard the evidence, and so the question becomes whether or not there was any reasonable facts presented to a jury that a reasonable jury could come back with the conclusion that it did, and that was the case of EEOC versus Kohler. And I cited that case in my brief, Your Honor, where as long as there is some evidence where a reasonable jury can come back with the decision that it did, then the court has to uphold that verdict. In this case, Mr. Robinson mentioned this in his argument on the appellate's opinion page 429. This was the investigation, this was as a result of the anonymous email that was sent on January 31st, around about that time, and they went for the first time, did some kind of an investigation, and they talked to Donald Lambert. Mr. Lambert indicated that he had heard some things, had heard some racial comments being made. It wasn't that hearsay, he specifically said he heard them. And then there was another guy, Chad Bateman, said, I have not heard him say anything, I just heard him say. But I questioned Mr. Bateman during the trial. I said, well, Mr. Bateman, you said in your email that you specifically heard these. But now, when the company asked you about it, you simply said, well, I may have heard some things being said. And so I think, obviously, the jury saw that Mr. Bateman, they really didn't put a whole lot of stock into Mr. Bateman's testimony, and they really believed that Mr. Bateman did, in fact, hear these comments. And so Mr. Bateman was the one that alerted the company again. Again, Mr. Bryant continued to complain. He even testified that after he suffered a heart attack around August of 2012, Mr. Bryant even testified that he was told to take his black ass out and to continue to paint. And all of these racial comments that were being made to Mr. Bryant, and again, the company didn't do anything to investigate it, they didn't take it seriously, never even talked to my client about it. And honestly, the jury was of the opinion that this company was not serious about issues of racial harassment. Let me interrupt you again. Yes, sir. Because the punitive damages amount and the due process challenge that you're familiar with. Yes, sir. I could not find on the ratio to use it. I know there are other factors, I get that. But on the ratio, I could not find one above $25,000 to one, and this is $250,000 to one. And you know the amount, if this were a Title VII, the punitive damages would be limited to $50,000. This is not a Title VII, 1981. I quite get it. Right. But let me finish one point. Yes, sir. I'm sorry. And so, no, no, no, no, you and I are talking. But when you put all these together, the Fifth Circuit's had a $125,000 to one in a hostile work environment case. And let's see, the Ninth Circuit had one that's in this range in a sexual harassment case, but that was a Title VII statutory case where the $50,000 was multiplied six times and came out to the $300,000. I'm sorry, pardon my math. But anyhow, if you look at all these cases that we've dug up, this does appear to be a very high ratio. How do you respond to that, Mr. Porter? Your Honor, my response to that is, again, as the United States Supreme Court in Kim said, we declined to impose a bright line ratio which a punitive damage award cannot exceed. And the court said that because there are no rigid benchmarks that a punitive damage award may not surpass, whenever you have a situation where you have a small compensatory damage that was awarded in this case, it was a nominal amount, and in that situation, just like in Campbell, the court said, well, the person in that case was awarded over $2 million, and so they felt that the compensatory damage and the punitive damage was also a part of the compensatory damage award. And so, they felt that Mr. Campbell had been sufficiently compensated in that case. But here you have a case where Mr. Bryant was only given $1 in compensatory damages, but you have a company that committed a very serious, egregious act. That is ignoring complaints of discrimination. So, I guess Jeffrey Sand may take the position that, well, since Mr. Bryant got $1, well, maybe he should get $10, or maybe he should get $20, or maybe he should get $100. And I got a $100 bill, but I don't have a $100.  No, sir, but I got a $100 bill here. Don't answer that question. That was meant in jest. Proceed with your argument. But, you know, those are arguments that, you know, that Jeffrey Sand made. And so, obviously, the jury was offended by the inaction of this company, and they felt that this company needed to be punished for its egregious act. And the egregious act in this situation was simply avoiding or even looking into complaints of Mr. Bryant. And it is interesting to note, you know, right after this email was sent on January 31st, Mr. Bryant was terminated two weeks later. And so, they just didn't, obviously, did not even take his complaint seriously. They did not believe his complaint. Even during the trial, Mr. Bolton was of the position that he felt that Mr. Bryant was lying, that my client and Mr. Lambert were liars. And that was the position that he took. And he testified to that effect. And I asked him, I said, why didn't you talk to Mr. Bryant? Well, we just didn't think, we didn't believe him. We just felt that they were lying. And so, Your Honor, again, when you have a punitive damage award, and the question becomes, as this court said in EEOC v. Kohler, the court must determine whether there was sufficient evidence to support the jury verdict. A jury verdict must be affirmed unless viewing the evidence in the light most favorable to the prevailing party, we conclude that a reasonable jury could not find for that party. So, that's on the issue of liability. And also, whenever you're dealing with the issue of punitive damages, that's something within the purview of the jury. The jury listened to the testimony in this case. They assessed the credibility of the witnesses in this case. And they made its findings. So, Mr. Robinson, I guess, is asking this court to make credibility findings and to do something that really, that the court is really not in the position to do. At trial, Bryant did testify that he had reported the harassment, correct? That's correct, Your Honor. And now would have, and how much of that fell after the statute? Your Honor, Mr., I'm sorry, Mr. Bryant. I'm sorry, within the statute, I should say. Yes, Mr. Bryant testified, Your Honor, that he continued to complain to management officials, even after they made this, I don't even call it an investigation, but a look-see, where they sent Mr. Marshall out to the court to just kind of to observe. Mr. Bryant testified that he continued to make complaints, but once he got the position from Mr. Whitcliffe, that Mr. Bryant just felt that there was nothing else that he could do. He continued to complain, and so he felt that after he had that conversation with Mr. Whitcliffe, who was the president of the company, that there was nothing else that he could do, that he had done all that he could do to bring it to the attention of management officials. And so his testimony, and obviously the jury believed him, that he continued to complain, even during the time period when he suffered a heart attack while he was at job due to the stress that he was under, that he even, that when he came back some two or three weeks later, this guy continued to harass him and subject him to racial terms. And his brother even testified, Your Honor, Dale Bryant testified during a staff meeting that this Jerry Skaggs referred to my client as porch monkey, grease monkey, and that Mr. Bolton was there, and they laughed about it. They thought it was funny. And so, again, these things occurred even after the May of 2012 complaint that they supposedly looked into. And my client even testified about that. And obviously the jury believed him on that. And so we believe... So the statute begins in July of 2012, right? The statute of limitation? Yeah. It reaches back as far as July of 2012, right? I agree. We all agree on that. Yeah. Bryant complained to Wycliffe four times, right? Correct. He testified. Correct. How, if you look at that, and you know how we do it, the other side knows how we do it, most sympathetic to the jury's understanding, do any of his complaints fall after July of 2012? Your Honor, I believe that the complaints do fall after that time period. And you read his testimony, that's what we'll think? Yes. I believe that's what you would gather, get from his testimony. We know one of them wasn't because one of them was apparently in May of 2012. Correct. And it makes sense because here Mr. Wycliffe told my client that he had turned the matter over to Kenny Bolton. Kenny Bolton apparently made some kind... That's when Mr. Bolton sent Mr. Marshall out to the court to look into the situation. Well, Mr. Bryant said that he continued to complain to Mr. Wycliffe again, and Mr. Wycliffe told him he turned it over to Mr. Bolton. So it's apparent that those complaints did fall after the time period of July of 2012. Thank you. That was my point. That was within that time period. As far as on the issue of attorney's fees, Your Honor, I stand by my brief on that. I indicated what my reasonable, my customary hourly rate was. I indicated in my affidavit, I pointed out where I was awarded hourly rates in other cases. I've been doing this for 32 years. And so I think the court got it right. And we would ask that you affirm the decision of the trial court in this case. So thank you for your time. Thank you, Mr. Porter. Back to you, Mr. Robinson. Let me just... Let me get up here. Let me address this very quickly. What he said about the brother's testimony, that Bryant said that that's also corrected in our reply brief. That's not what that witness testified to. It was Mr. Bryant's brother. He did not testify to what was just represented to you. We did make the Klein argument. It's at the appellant's appendix, page 334. Are you familiar with Madison v. IBP? I think so, Your Honor. It purports to say that as long as any act of harassment occurs within the limitation period, that you can recover damages for all the harassment even outside the limitation period? And that's what Klein says. Because it says... Klein says things that happen... I thought you said... I thought you were arguing that you can only claim, get damages for what occurred within the limitation period. That's what Klein says. There has to have... Something has to have happened within the statutory period of limitations that's illegal in order for these other things to become pertinent for liability. But you... Well, and damages. I mean, do you agree that if there's one act of harassment within the four years, that then they get everything? No. I don't think that's what Klein says. As a matter of fact... That seems to be what Madison v. IBP says. What Klein says is... The cases are not in conflict and they talk about Gibson and Jensen. Anyway, what the penultimate... The cases are therefore not in conflict and the instructions limiting the recovery of damages to events that happened within the limitations period were correct. Okay. So, that's what this case says. Thank you for your argument. The case has been well-argumented. And case number 18-2297 is submitted for decision by the court.